**UNITED STATES of America,**
**Appellee,**

v.

**D. Spencer GROW and C. Oran Mensik,**
**Appellants.**

**No. 9412.**

United States Court of Appeals
Fourth Circuit.

March 18, 1968.

**184**

E. Tillman Stirling, Washington, D. C. (Edward P. Morgan and Welch, Mott & Morgan, Washington, D. C., on brief), for appellant D. Spencer Grow.

Kinsey T. James, Peoria, Ill. (Joseph S. Bambacus, Richmond, Va., and Anna R. Lavin, Chicago, Ill., on brief), for appellant C. Oran Mensik.

Thomas P. Curran, Attorney, Department of Justice (C. Vernon Spratley, Jr., and Thomas J. Kenney, U. S. Attys., and Benjamin R. Civiletti, Sp. Asst. U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, BOREMAN and J. SPENCER BELL,* Circuit Judges.

BOREMAN, Circuit Judge:

D. Spencer Grow and C. Oran Mensik, defendants below and appellants here, were indicted on February 19, 1963, in the United States District Court for the District of Maryland together with Charles F. Culver, A. Gordon Boone, J.

---

* Judge Bell participated in the hearing and concurred in the disposition of the case but died before the opinion was prepared.

Thomas Ellicott and Henry McGurren. The nine-count indictment [1] charged them with devising a scheme to defraud and using the United States mails in furtherance of the scheme in violation of §§ 2 [2] and 1341 [3] of Title 18, United States Code. On September 23, 1963, Culver tendered and the court accepted a plea of nolo contendere; Boone and Ellicott were to be tried separately.

Various motions were heard on several separate days in September and October 1963. Pre-trial motions, including motions to suppress certain evidence, were denied by the court in a formal opinion.[4]

Starting to trial in Baltimore, Maryland, on October 11, 1963, eight days were consumed in selecting twelve jurors and two alternates. Motions filed on behalf of Grow, Mensik and McGurren for a transfer, previously argued and denied, were renewed and granted because of an apparent prejudice prevailing in the District of Maryland. The Maryland jurors thus selected were excused. The case was then transferred to Richmond, Virginia, for trial and, as to Grow, Mensik and McGurren, the trial proceedings commenced before a jury on November 4, 1963. The *voir dire* examination and selection of the jury had required three days. Honorable Roszel C. Thomsen, Chief Judge of the United States District Court for the District of Maryland, had been designated as the trial judge by the Honorable Simon E. Sobeloff, then the Chief Judge of this court.

At the close of the Government's case the judge granted McGurren's motion for judgment of acquittal. Similar motions by Grow and Mensik were denied and these defendants elected not to testify in their own defense. The court did, however, direct the jury to return a verdict of acquittal as to Grow and Mensik on that portion of Count 1 which charged the defendants with using the United States mails for mailing a certain letter on October 28, 1959, and on Count 2, the case going to the jury on the remaining counts. The jury found Grow guilty on Counts 3 and 8 and Mensik guilty on Counts 6, 7 and 8. Motions for judgments n. o. v. or in the alternative for new trials were denied and sentences of fines and imprisonment were imposed.

Each of the appellants challenges the sufficiency of the evidence to sustain his conviction. The facts, circumstances and transactions concerning which evidence was introduced are many and varied and to state them in detail would require volumes. We shall undertake to outline as briefly as possible those which the prosecution contends are sufficient, when viewed in the light most favorable to the Government to prove the guilt of Grow and Mensik beyond a reasonable doubt.

1. Set forth in Appendix A to this opinion are Counts 3, 6, 7 and 8 and the pertinent portions of Count 1 which are repeated, realleged and reiterated in each of the other counts.

2. § 2. Principals. (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal. As amended Oct. 31, 1951, c. 655, § 17b, 65 Stat. 717.

3. § 1341. Frauds and swindles. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 763; amended May 24, 1949, c. 139, § 34, 63 Stat. 94.

4. United States v. Culver, 224 F.Supp. 419 (D.C.Md.1963).

In 1957 C. Oran Mensik, a Chicago savings and loan company operator, was president and chairman of the board of City Savings and Loan Association and a majority stockholder in 1st Guaranty Savings and Loan Association of Chicago. Late in the year 1957 he established in Maryland the Commercial Savings and Loan Association, and it was set up at Mensik's direction by Robert Suchman who was a savings teller in a Chicago savings and loan association. Mensik dominated and controlled Commercial's activities including those with respect to employees, advertising, investments and dividends. The guaranteed stock in Commercial was held by the Dollar Investment Co. of Chicago which Mensik dominated and whose nominal president was Robert Kramer, Mensik's brother-in-law.

In 1958 D. Spencer Grow was president of the Utah Savings and Loan Association and controlled Western Land Corporation, both of Utah, and was president of and owned the capital stock of Prudential Savings and Loan Association and Idaho Savings and Loan Association, both of Idaho. In April of 1959 Grow established his first savings and loan association in Maryland. He directed Harold Applegarth, of Baltimore, who was familiar with organizing and chartering savings and loan associations, to set up the First Fidelity Savings and Loan Association. Grow owned and controlled it and Applegarth became its president.

International Guaranty and Insurance Co., Tangier, Morocco, purported to insure depositors' savings accounts in Grow's Utah Savings and Loan Association and Mensik's Commercial Savings and Loan Association. The Insurance Commissioner of Utah, Carl Hulbert, advised Grow in the fall of 1958, in effect, that the funds of International Guaranty and Insurance Co. had been seized in California, that the Utah Insurance Department considered any insurance issued by that company as worthless and that Grow should cease advertising that the deposit

accounts in Utah Savings and Loan Association were insured.

This information obviously reached Mensik and in late 1958 he sent Robert Suchman and Henry McGurren, the latter a Chicago attorney and former "North American counsel" for International Guaranty and Insurance Co., to Salt Lake City, Utah, to meet with Grow and organize an insurance company to be used instead of International Guaranty. Financial Guaranty and Insurance Co., Tangier, Morocco, was formed and Grow and his close associates comprised its "Western Advisory Board." McGurren became its "North American counsel."

In January of 1959 Grow summoned Harold Applegarth to Chicago. Applegarth met with Grow, Mensik and McGurren. Grow informed Applegarth of his problems with the Utah Insurance Commissioner; Mensik informed Applegarth of his problems in Chicago and Maryland (Mensik and Commercial had been indicted for mail fraud). Mensik and Grow employed Applegarth and instructed him to procure old savings and loan association charters and convert them into new savings and loan associations. Applegarth was told that, if savings and loan associations were to be successful in obtaining deposits, insurance was helpful, if not absolutely necessary, and there would be no difficulty in getting insurance.

Applegarth acquired old Maryland charters in Baltimore and, at Mensik's instruction, converted them into two new associations. The first was intended to be Mensik's but as a courtesy he allowed Grow to acquire it and this was First Fidelity Savings and Loan Association. The guaranteed stock was held in Applegarth's name as nominee for Grow or Western Land Corporation. The second new association became Maryland Thrift Savings and Loan Association whose guaranteed stock was held in the name of Dollar Investment Co. for Mensik.

This pattern of acquisition of savings and loan associations and concealed ownership by either Grow or Mensik was lat-

er repeated in First Guarantee Savings and Loan Association, Maryland District Savings and Loan Association, First Financial Savings and Loan Association, First General Savings and Loan Association and Maryland Financial Savings and Loan Association.

On the day of its opening, March 24, 1959, First Fidelity Savings and Loan Association promptly acquired insurance for savings accounts from Financial Guaranty and Insurance Co. through McGurren, and Grow sent advertising material which had been prepared through Pace Advertising in Provo, Utah, to Applegarth in Baltimore for a mailing campaign which was to begin on April 6, 1959. Grow's Utah Savings and Loan Association and Mensik's Commercial Savings and Loan Association acquired insurance coverage from Financial Guaranty and Insurance Co.; Suchman sent a $24,000 premium to McGurren. However, Utah Insurance Commissioner Hulbert would not approve Financial Guaranty and Insurance Co. as an insurer on its name alone and requested Grow to furnish information on Financial's background, officers, directors and stockholders. Hulbert warned Grow that a public hearing might be necessary. Following his initial request in early April 1959, Commissioner Hulbert twice more asked for supporting information on Financial Guaranty and Insurance Co. and on June 4, 1959, advised Grow that if he did not get the requested information he would issue a cease and desist order against Financial and publicize that it was not authorized to do business in Utah. Hulbert further advised Grow that for an insurance carrier to be acceptable to him, under Utah law, it must be a domestic company which could meet certain capital-surplus requirements and with $400,000 in U. S. Government or approved bonds on deposit with officials of one or more states for the availability

of general creditors in case of company insolvency. Hulbert had directed Grow to cease advertising in Utah that Utah Savings and Loan Association's accounts were insured and Grow had complied. The evidence clearly supports the inferences that the persistent request for information on Financial Guaranty and Insurance Co. and the possible consequences of public hearings concerning Utah Savings and Loan Association and Financial Guaranty threatened to thwart the advertising campaigns and ruin Grow's and Mensik's established savings and loan companies, as well as new ones in Maryland, and that Grow and Mensik were thus motivated to form a new insurance company which would quiet the Utah Commissioner and still be the subject of advertising and publicity to attract deposits and promote further expansion in Maryland.

On or about April 15, 1959, Henry McGurren went to Toronto, Canada, and arranged with a young Canadian lawyer, David R. Vine, for the use of his office as a mailing address for International Guaranty and Insurance Co. and Financial Guaranty and Insurance Co., where any mail directed to them would be held for McGurren. Between mid-April and the end of June, 1959, in a series of meetings and through correspondence, McGurren advised Vine that he represented savings and loan association clients who wanted to form a Maryland insurance company which would engage in the insuring of accounts in privately owned savings and loan associations. Vine was directed to, and did, form two Canadian corporations (Lock Securities, Ltd., and Channel Investment, Ltd.).[5] It was understood that these companies were to hold the stock in a Maryland insurance company and the stock of the Canadian companies would, in turn, be held by two Tangier, Morocco, companies, namely, Prospectors and Invest-

5. Lock Securities, Ltd., and Channel Investment, Ltd., were organized in Canada by Vine in early July 1959 with Vine, his father and his wife as directors. Vine was president of both. The "letters patent" provided that meetings of the shareholders of these companies could be held anywhere within the province of Toronto, at Chicago, Illinois, or Salt Lake City, Utah.

ors, Ltd., and Nautilus Associates, Ltd. McGurren advised Vine: "I want to be sure that the stockholders, Nautilus Associates, Ltd., and Prospectors and Investors, Ltd., as the case may be, will always maintain a status so as to control the company either as a shareholder or by being in a position to change any director * * *."

At about the same time that McGurren was meeting and corresponding with Vine, Mensik met with A. Gordon Boone of Maryland (the latter being one of the defendants named in the indictment) in Baltimore at the Emerson Hotel. Robert Suchman, who was present during a part of the discussion, testified that Mensik and Boone discussed the formation of a Maryland insurance company which would have some local stockholders and it was understood that Boone should select a manager or president and fix the salary he should receive. Grow obviously knew of the plan as he advised Applegarth they would probably soon have a Maryland insurer to insure their accounts and that A. Gordon Boone would be connected with it.

At a casual meeting in May 1959, Boone told Charles F. Culver, a general insurance agent and Boone's fellow member of the Maryland legislature, that he was forming an insurance company. Culver, who was experienced in the insurance business, asked that he not be forgotten and later, in August 1959, Boone informed Culver, who had suffered a heart attack and was then ill, that he, Culver, had been elected as the president of Security Financial Insurance Co.[6] which had been incorporated in Maryland, that Culver's salary was to be $200 per month and that he need not devote more than about two hours twice each week to the corporation's affairs. Culver's salary was substantially increased thereafter.

In late June 1959 Grow advised Commissioner Hulbert that insurance for Utah Savings and Loan Association's depositors would be available by July 13, 1959, and that the insuring company would satisfy the Commissioner's requirements. Grow later postponed this date until the end of July and Hulbert fixed a deadline as of July 31.

Prior to July 28, 1959, McGurren had given Vine an outline of the method of financing SFIC and on that date McGurren and Robert Kramer, Mensik's brother-in-law, went to Toronto and with Vine carried the previous outline into effect. About $216,000, (3%) Canadian Government bonds, $50,000 in treasury bills, a $30,000 draft and a certified check for $100,000, aggregating in value approximately $400,000, were produced by McGurren. The bonds, bills, etc., were converted into cash and the funds were deposited in the Bank of Nova Scotia in accounts opened in the names of Lock Securities, Ltd., and Channel Investment, Ltd. Bank drafts in the amount of $390,000 were obtained with which to purchase "shares" of SFIC, according to Vine's testimony. This left a small balance in each of the bank accounts established for Lock Securities and Channel Investment. Lock and Channel then issued promissory notes to specific companies for amounts owed to them, notes in the amount of $270,000 to Financial Guaranty and Insurance Co., about $100,000 in notes to Universal Fidelity Insurance Co., and about $30,000 in notes to Western Land Corporation. At McGurren's request one note of $135,000 to Financial Guaranty and Insurance Co. was exchanged for two notes, one for $100,000 to Financial Guaranty and one for $35,000 to First Fidelity Savings and Loan Association in Baltimore. These notes were delivered to McGurren and Vine testified that he later substituted "bearer notes" for the specific obligations from time to time at McGurren's direction.

On or about July 24, 1959, Grow advised Applegarth it appeared that First Fidelity Savings and Loan Association was going to have a Maryland insurer

---

6. Security Financial Insurance Co. will be hereinafter referred to as SFIC.

and that he wanted Applegarth, acting for First Fidelity, to do two things in that connection, namely, (1) purchase $30,000 worth of *mortgage* insurance from Financial Guaranty and Insurance Co., pursuant to instructions to be given by McGurren, and (2) purchase a mortgage in the amount of $42,000 from First Fidelity Thrift and Loan Association (located in Provo, Utah, of which Grow was president) on property which was covered by a prior $7,000 mortgage held by the First Fidelity Thrift. These two things were accomplished. (First Fidelity of Baltimore sent its checks to First Fidelity Thrift of Provo, the $7,-000 mortgage was paid and $35,000 was returned to First Fidelity of Baltimore. This amount was turned over to Henry McGurren in cash by Applegarth and McGurren said, "Well, you have got yourself an insurance company," or words to that effect.) Mensik had previously instructed Robert Suchman, the president of Commercial Savings and Loan Association, to purchase *mortgage* insurance from Financial Guaranty and Insurance Co. and Suchman had paid in excess of $100,000 for it. However, Commercial never did receive a policy evidencing this mortgage insurance and First Fidelity Savings and Loan Association received its policy a year and a half later only after repeated requests from Applegarth.

The Canadian drafts aggregating $390,000 were run through McGurren's private bank account in Chicago and the funds were used to purchase New York drafts. On July 30 McGurren came to Baltimore and met with Boone and Suchman. Applegarth delivered $35,000 in cash to McGurren as stated above. Boone opened a bank account in the name of SFIC, used the drafts and cash to make an initial deposit of $425,000 and SFIC was incorporated in Maryland on July 30, 1959. Upon incorporation the following constituted SFIC's Board of Directors: A. Gordon Boone, J. Thomas Ellicott, Boone's law partner, and Lillian Kone, their secretary. The first meeting of the Board was held on July 31, 1959, and the officers elected were Charles F. Culver, President, Cazimir Szymaniski, Vice President, and Claude A. Hanley, a Baltimore attorney and former Maryland Insurance Commissioner, Secretary-Treasurer. Ellicott and Lillian Kone immediately resigned as directors and others were elected. The Board of Directors was then composed of five persons, W. H. Lind,[7] Michael J. Birmingham, A. Gordon Boone, Cazimir Szymaniski[8] and Berth C. Isaac.[9]

The total authorized common capital stock of SFIC, 250,000 shares, was issued, each share having a par value of $1. 16,206 shares were issued to A. Gordon Boone, 10,206 shares were issued to J. Thomas Ellicott, 3,000 shares to Michael J. Birmingham and the remainder to the two Canadian companies, Lock Securities, Ltd., and Channel Investment, Ltd. Boone and Ellicott became SFIC counsel.

Utah Commissioner Hulbert's last deadline to Grow was by letter on September 2, 1959. He advised Grow that

---

7. Lind, Grow's brother-in-law, was an officer in the Idaho Savings and Loan Association, Idaho, and in Prudential Savings and Loan Association, Idaho.

8. Szymaniski, a resident of Chicago, Illinois, was a builder and president of the Parkwood Building Co., a company formed by Mensik and one of the three building companies to which Commercial Savings and Loan Association made the majority of its loans. Later SFIC was informed he became the president of Maryland District Savings and Loan Association.

9. Isaac was a vice president of Utah Savings and Loan Association, hired by Grow in July 1959 and in September or October of 1959 was asked by Grow to be on the Board of SFIC. Isaac never received any notices of meetings nor was he ever consulted about the business or affairs of SFIC. Isaac discussed resignation as a director with Grow and Lind and after Culver wrote to Grow and requested the resignations of Isaac and Lind, Grow sent such resignations to SFIC in January 1960.

unless the insurance matter was straightened out by September 15, 1959, the steps, previously threatened, would be taken. On September 14, 1959, SFIC was licensed in Maryland and authorized to do business by the Maryland Insurance Department and on that very date binders of insurance on savings accounts were issued to the Utah Savings and Loan Association and First Fidelity Savings and Loan Association of Baltimore. Grow was in Baltimore and personally picked up the binders and delivered First Fidelity's to Applegarth. In rapid succession SFIC issued thirty-to sixty-day binders of insurance on savings share accounts to the following associations and on the specified dates: Prudential Savings and Loan Association, Idaho, September 28, 1959; Maryland Thrift Savings and Loan Association, Baltimore, September 28, 1959; Idaho Savings and Loan Association, Idaho, November 16, 1959; Commercial Savings and Loan Association, Baltimore, December 1, 1959. As of December 1, 1959, SFIC purported to insure savings share accounts in four Grow associations and two Mensik associations. These binders were issued by SFIC without any audits or examinations of the associations and without any estimate of risks insured. At the "meeting" at which these binders were authorized the only director physically present was Boone and he voted the proxies of Szymaniski and Birmingham.

At the time of the issuance of the insurance binders, applications had not been received and eligibility or initial premium payments of $1,000 had not been made. SFIC had little, if any, information or record concerning its insureds. At Grow's direction and with his knowledge Applegarth back-dated First Fidelity's correspondence with SFIC and the application for insurance after Grow had been issued the binder in September and the initial eligibility fee was not paid until December. Robert Suchman did the same thing for Commercial Savings and Loan Association at the direction of Mensik and, in response to an earlier inquiry from Suchman concerning applying for insurance from SFIC, Mensik said: "We do not want to get this insurance right away, Bob, because people will accuse us of being connected with the insurance company."

On December 12, 1959, Grow, Ellicott, Culver and others held a meeting at the offices of SFIC in Baltimore and correspondence and documents were prepared by a "Kelly Girl," Miss Jean Keene. Eligibility payments were made and an entire file, including a binder, was created for the Idaho Savings and Loan Association, Grow having brought appropriate stationery with him to Baltimore for this particular meeting. The explanation was offered through Culver that a duplicate file on Idaho was created to replace a file which Ellicott said he had lost. A call from the Associated Press concerning insurance of Idaho Savings and Loan accounts and an impending visit from the Maryland Insurance Department's examiner could well have precipitated these maneuvers.

SFIC established two channels through which it proposed to receive information on the conditions and operations of insured savings and loan associations and associations seeking insurance. One was a form of "Monthly Report," printed by SFIC and distributed to its insured saving and loan associations. The other regular source of information was Bernard S. Aiken. In the latter part of October 1959, SFIC had engaged the accounting firm of Sidney London and Co., but principally the services of an associate of that firm, Bernard S. Aiken, to make examinations of associations which applied for insurance and to reexamine insured associations on an annual basis. Aiken had previously made examinations of several Mensik associations and was hired by Culver, SFIC's president, upon Suchman's recommendation to Ellicott. Aiken submitted to SFIC written reports of his examinations and discussed them with Culver. Aiken also met with Mensik in Chicago and discussed with Mensik

various aspects of the savings and loan association examinations which he was making on behalf of SFIC. His discussions with Mensik included results of examinations of Commercial Savings and Loan Association, Maryland Thrift Savings and Loan Association, Maryland District Savings and Loan Association, First Financial Savings and Loan Association, First General Savings and Loan Association and Maryland Financial Savings and Loan Association. Particularly on these occasions he discussed with Mensik the critical portions of the reports labeled "Confidential Comments." The expenses of these trips of Aiken to Chicago were borne by SFIC.

In the summer of 1960 Boone, Ellicott and Culver met with Mensik and advised him that they were displeased with Aiken. Boone and Ellicott were displeased because Aiken had criticized certain legal fees paid to them by SFIC. Culver was dissatisfied because Aiken was not, in his opinion, giving a full picture of the condition of savings and loan associations in the report of examinations and because Aiken was too close to the insured associations. Mensik told them that "Bernie" (Aiken) was good to have because he was "flexible." Aiken was retained as SFIC accountant.

In January of 1960 Aiken was directed to begin an examination of the Utah Savings and Loan Association. C. M. Gilmour, an attorney of Salt Lake City, was hired by Boone to work toward getting SFIC licensed in the State of Utah. As a result, SFIC was furnished with an examination report by Aiken, a report letter from Gilmour and a third report identified by Aiken as a report of examination of the Utah Savings and Loan Association by the Banking Commissioner of Utah. These reports indicated, in effect, that Utah Savings and Loan Association was and had been in a very precarious financial condition due to Grow's mismanagement. SFIC and Culver had been informed through Aiken's reports that Grow's First Fidelity Savings and Loan Association was in bad

financial condition, that its books were in horrible shape and that Applegarth, its president, was spending funds recklessly. Within a short time after the Gilmour letter was received in April of 1960, Culver discussed these conditions with Grow and continued to discuss them with him on every occasion that he saw him. Grow advised Culver that he was trying to work out these problems. Culver, in March of 1960, complained to Mensik in Chicago about Grow and the reported situation in the Utah Savings and Loan Association and First Fidelity. Mensik told Culver, Boone and Ellicott that Grow had had a difficult time and that he, Mensik, would talk with him. However, insurance binders on the Utah Savings and Loan Association and First Fidelity were continuously and automatically renewed by SFIC throughout 1960 and 1961.

About the middle of January 1960, Aiken reported to SFIC on Maryland Thrift Savings and Loan, informing SFIC that Maryland Thrift had assets of $43,000 and that for the eleven-month period ending November 30, 1959, it had a net loss from operations. He next examined this association as of April 30, 1960, and his report delivered to SFIC in early June 1960 disclosed that Maryland Thrift continued to have an operating loss and that the association had paid dividends illegally. SFIC's Monthly Reports from Maryland Thrift indicated operating losses through 1961 but a growth in savings accounts from approximately $25,000 to more than $600,000. Maryland Thrift had been issued an insurance binder on September 30, 1959, and it was never canceled.

Maryland District Savings and Loan Association (a Mensik association) made application for insurance on December 15, 1959. Aiken's report of December 23, 1959, informed SFIC that for the year ending that date the association had reported a loss. However, the insurance binder to Maryland District was issued by SFIC on December 28, 1959. Aiken's subsequent reports informed SFIC that Maryland District had operated at a loss

for the first four months of 1960, that the loss would likely continue and that Maryland District was operating from the same office as Commercial Savings and Loan Association in Baltimore. SFIC automatically renewed the insurance binders to Maryland District.

Applegarth had purchased, for Grow, Broadway Savings and Loan Association but the name was later changed to First Guarantee Savings and Loan Association, chartered in Maryland. The stock was held by Irwin Phelps, a former Utah Savings and Loan employee, as nominee for Grow. Aiken transmitted to SFIC a report of an examination of this association on July 11, 1960, and the report disclosed that the total capital and liabilities of First Guarantee were $10,500, and that for the six-month period ending June 30, 1960, its income of over $14,500 was derived from interest on time deposits. SFIC approved the issuance of the policy to this association on July 19, 1960, effective July 1, 1960. The next Aiken report informed SFIC that First Guarantee Savings and Loan Association had operated at a deficit for the nine months ending March 31, 1961. Monthly Reports to SFIC indicated continued operating losses by First Guarantee but by May 31, 1961, it was disclosed that deposits had grown to over $800,000.

Three Mensik savings and loan associations, First Financial, First General and Maryland Financial, were reported by Aiken as having just been incorporated and as not having engaged in any transactions involving a profit or loss. Further, Aiken reported their capitalizations to be below $8,000 as of the dates of the reports sent to SFIC in June and July of 1960 and January 11, 1961. The first two associations were issued policies by SFIC on July 19, 1960, and Maryland Financial was issued a policy on January 15, 1961.

One Murray Michael was president of Military Service Savings and Loan Association, Maryland, and in December of 1959 he approached Harold Applegarth, president of First Fidelity, concerning the possibility of obtaining SFIC insurance. Applegarth told Michael to see Grow and that if Grow became a part owner of Military Service Savings and Loan or obtained control over it, he would have a good chance of obtaining SFIC insurance. Applegarth repeated this conversation to Grow and Grow told him that Michael had been to Utah to see him and Grow directed Applegarth to take Michael to Culver so that Michael could apply for insurance. Michael applied for and obtained SFIC coverage. Aiken's communications and SFIC's Monthly Reports on Military Service Savings and Loan disclosed operating losses and that there were no complete records for over $800,000 in mortgages in which this association had invested its depositors' funds.

In the spring of 1960, Grow and Mensik persuaded SFIC to insure another western savings and loan association, First Fidelity Thrift and Loan of Utah, although Culver was adamant in his opposition to the issuance of a binder since no audits or examinations of the association had been made. In this instance the binder was canceled in a short time due to Culver's opposition and the apparent desire of Grow and Mensik that Culver be retained by SFIC. On one other occasion Culver resisted the automatic granting of insurance to a Mensik controlled association, the Progressive Annapolis Savings and Loan Association of Maryland. Mensik told Culver that he had invested a lot of money and needed the insurance. Culver resisted because he had given his word to another association in Annapolis, an independent not controlled by Grow or Mensik, that no other association there would be insured.[10] Culver submitted his resignation, Boone and Mensik discussed it and both the application and resignation were withdrawn. However, Progressive

10. Culver testified that the savings of these small independents comprised less than ten per cent of the total of $45,-000,000 in savings accounts which SFIC purported to insure.

Annapolis merged with an insured association, Hagerstown Savings and Loan Association, Maryland, and Mensik's purpose was accomplished.

In January of 1960 Boone, Ellicott and Culver flew to Salt Lake City, Utah, to meet Grow. Grow told them that it was urgent that SFIC be licensed in Utah so that he could advertise there that Utah Savings and Loan Association's deposits were insured. Insurance Commissioner Hulbert was unavailable but the group met with Utah Banking Commissioner Taylor. Commissioner Taylor immediately demanded information as to who owned the company and who was behind the Canadian companies, Lock Securities and Channel Investment. They answered that *they did not know*. The Insurance Commissioner of Maryland received the same answer to the same question from Boone, Ellicott and Culver a short time later. In April of 1960 Boone, Ellicott and Culver went to Chicago to meet with Mensik and McGurren. They told Mensik of the pressure being applied by these insurance departments and that they had to have something in the way of information to give to the Commissioners. McGurren advised that he would try to get it.

McGurren went to Canada and had Vine execute affidavits of ownership which stated that the books and records of Lock Securities and Channel Investment disclosed that Vine, his wife and father were the sole shareholders of these companies. These affidavits were made on April 21, 1960. Vine's father was then dead. On that same day or the day following, McGurren had Vine and his wife execute Declarations of Trust to the effect that they held the shares of Lock Securities and Channel Investment as nominees for Nautilus Associates, Ltd., and Prospectors and Investors, Ltd. The affidavits, which may be characterized as literally true but inherently misleading, were sent to SFIC and then forwarded to the Insurance Commissioners of Idaho, Utah and Maryland.

From its very beginning SFIC conducted a campaign of promotion and ad-vertising through letters, decals, plaques, shields, sample policies, financial statements and passbook stuffers. Sometime in March 1960 Ellicott had prepared for SFIC a "question-and-answer" brochure which, according to Culver's testimony, was ordered from an advertising firm. Between March and December of 1960 these brochures were ordered by SFIC in large quantities, totaling over 175,000. Some were delivered to SFIC while others were delivered directly to First General Savings and Loan Association and First Financial Savings and Loan.

In the "question-and-answer" brochure the first question was:

"What is the Security Financial Insurance Corporation?"

The answer to this question was, in part, as follows:

"The company is dedicated to guarantee the safety of savings in the institutions that it insured."

The ninth question was as follows:

"What protection is offered savers who place funds in institutions insured by Security Financial Insurance Corporation?"

The answer to that question advised as follows:

"Savings are protected by: a. Insurance company requires annual examinations of the insured institution. b. Security found in real estate mortgages, U. S. Government bonds and other assets. c. Sound, progressive operating policies. d. Insurance against loss offered by Security Financial Insurance Corporation."

SFIC was constantly receiving letters from depositors and prospective depositors in its insured savings and loan associations. Persons throughout the country were inquiring about the safety of their savings, about SFIC and about the savings and loan associations. Culver discussed the replies of SFIC with Boone and Ellicott, answered the inquiries and enclosed with the replies the question-and-answer brochures and other promotional material. Supplies of the question-and-answer brochures were distrib-

uted to the insured savings and loan associations which solicited them. Suchman testified that soon after the brochure was prepared Mensik told him that he liked the way it was written and directed Suchman to send it to shareholders of Commercial Savings and Loan who inquired about SFIC. Commercial had procured insurance from SFIC in December of 1959 and Suchman was Commercial's president.

The question-and-answer brochure was distributed to Grow-controlled associations in April 1960, and additional quantities were sent within ten days after the first distribution. In the fall of 1960 Grow visited First Guarantee Savings and Loan Association on at least two occasions. He checked the Association's files to determine how depositors' inquiries were being handled, whether printed matter was being sent and advised Phelps, then president of First Guarantee, how the inquiries should be answered. He particularly wanted SFIC's brochure sent out and told Phelps it was a good brochure and that it answered people's questions about SFIC.

Late in 1960 or early in 1961, Mensik suggested to Culver that SFIC should engage in newspaper advertising and showed Culver a draft of an ad which had been prepared at Mensik's direction by Sigmund Aiken, an advertising man. At a second meeting in late January or early February, Mensik was shown a layout of an ad prepared by another advertising agency. Mensik was pleased with the layout although he suggested unsuccessfully that it should include a list of savings and loan associations insured by SFIC. It was published by SFIC as a full-page advertisement in the Baltimore Sunday Sun on February 5, 1961. It read, in part: "Does your savings and loan association display this sign of Security in its offices and advertisements? If it does, you'll be interested to know your Savings and Loan Association *earned* the privilege of displaying this emblem * * *."

In early April of 1961, Culver, Boone, Ellicott, Mensik and McGurren met in Baltimore to discuss a recently enacted Maryland law which had the effect of prohibiting SFIC from granting insurance to any additional savings and loan associations. By letter, Culver had agreed with the Insurance Commissioner of Maryland that SFIC would obey the law although it was not to become effective until two years later. Mensik criticized Boone and Culver for the passage of the law and particularly for agreeing to comply with the Commissioner's demand. Mensik said it would destroy SFIC and its insured associations. Shortly after this meeting Culver tendered his resignation to McGurren. McGurren persuaded Culver to remain until a replacement could be found. Boone and Ellicott visited Chicago and upon their return the entire board of directors of SFIC resigned on July 17, 1961.

A meeting of SFIC stockholders was held in Baltimore the following day. McGurren was present representing the stockholders and a new board of directors was elected. Its members were David F. Woods, George Christian, William Peat, Thomas Paul Raimondi and Richard Rosche. Mr. Woods was elected president and chairman of the board, while Mr. Rosche became office manager. Mr. Woods was a former public relations man, realtor and free-lance writer and had never been in the insurance business. Mr. Christian at the time was president of Maryland District Savings and Loan Association and had been assigned by Mensik and McGurren the duty of inspection of First General, First Financial, Maryland District, Progressive Annapolis and Maryland Thrift Savings and Loan Associations. Mr. Rosche at the time was manager of First General Savings and Loan Association. At about the time of his selection as office manager of SFIC, Rosche met with Mensik, McGurren and Kramer in Chicago and they outlined to him what his duties would be. Raimondi was then president of First Fidelity Savings and Loan Association and the holder of the guaranteed stock in First Guarantee Savings

and Loan Association for Grow. Ellicott remained as counsel for SFIC.

The Government contends that the foregoing recitals of evidence showed Grow's part in controlling SFIC, his participation in the scheme and, consequently, his responsibility for the representations made to investors and prospective investors interested in obtaining an interest return on their deposits; that the Government's evidence was sufficient to prove that Grow had a consuming interest in advertising, that he directed the advertising for First Fidelity Savings and Loan and the western associations in Utah and Idaho through Pace Advertising in Provo, Utah; that advertising of the insurance of deposits by his controlled savings and loan associations was automatic and that his principal objective in the creation of SFIC was to place his associations in position to so advertise; that the evidence showed specifically that Grow requested financial statements and was interested in them for advertising purposes; that he requested a supply of question-and-answer brochures prior to April 11, 1960; that a supply was sent upon solicitation; that within ten days after receiving the first supply 2000 more brochures were sent to each of Grow's western associations; that he approved the brochure and instructed Phelps, president of First Guarantee, to send the brochure to depositors in response to inquiries. The Government further contends that the evidence relating to the issuance of insurance binders to Grow's associations and their automatic renewal, the evidence of the backdating session of December 12, 1959, the testimony of Culver that everytime he saw Grow he discussed with Grow the reported poor conditions in First Fidelity and Utah Savings and Loan and that Grow stated he was trying to do something to correct the situation, all tend to support the inference that Grow had knowledge of the falsity of the representations.

The Government further contends that the evidence discloses Mensik's direct connection with the formation of the scheme and the use of the mails in furtherance thereof.

The Government did not contend that all of the defendants named in the indictment were together at any one time and then and there planned and devised a scheme to defraud prospective depositors in the savings and loan associations insured by SFIC. The jury was so instructed. In substance and by way of summarizing, the prosecution contends: that the indictment charged and the evidence proved a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises while at the same time willfully concealing material and qualifying facts; that the representations charged were that SFIC was dedicated to guarantee savings; that SFIC required reporting and examinations so that it could exercise strict supervision of the insured savings and loan associations and require them to maintain high standards of financial responsibility; that SFIC insured only qualified associations which had earned the right to insurance; that the specific representations were proved to have been made by letters, question-and-answer brochures, sample policies, financial statements and newspaper advertisements.

Consistent with the theory of the prosecution, the court told the jury:

"It is sufficient that a scheme to defraud and to obtain money by false pretenses and representations, as alleged in the indictment, was conceived in the minds of one or more of the five defendants who remain in the case, namely, Mensik, Grow, Boone, Ellicott and Culver [the court had at that time ended the case as to McGurren]. If it was and if Grow or Mensik, with knowledge of the scope of the scheme, knowingly and intentionally entered into and participated therein, then he would be a party to the scheme and responsible in law for the acts of his fellow participants, in furtherance of the scheme if committed during the existence of the scheme and his participation therein."

Again, consistent with the basic theory of the prosecution, the court explained to the jury that it was an essential element of the offenses charged that the making of at least one of the alleged representations or pretenses was a part of the scheme; that any such representation or pretense was untrue and was made in furtherance of the scheme and with knowledge of the falsity thereof when made; and that the jury must so find before it could convict on the substantive charges of use of the mails in furtherance of the scheme. The court further told the jury that the indictment charged that the defendants, while making false and fraudulent pretenses and representations would and did knowingly and willfully conceal material and qualifying facts as follows:

(a) That SFIC was organized, incorporated and operated by the defendants for the primary purpose of enabling savings and loan associations controlled and dominated and to be controlled and dominated by the defendants Mensik, Grow, and Ellicott to advertise that savings accounts in said savings and loan associations were "insured"; and

(b) That SFIC and its officers and directors were continually informed that savings and loan associations insured by SFIC, including those associations dominated and controlled by Ellicott, Grow and Mensik, were being operated in a manner inconsistent with sound financial practices and in a manner that jeopardized the safety and security of the funds invested by investors in savings accounts in their associations.

The additional explanation was made that proof of such concealment was not an essential part of the case as was proof of one of the misrepresentations "an essential part," but evidence with respect to alleged concealments might be considered by the jury in deciding "the points which are essential."

The Government produced evidence to show that Grow and Mensik were in the established business of operating savings and loan associations in which they had substantial and controlling financial interests although in several instances their ownership was concealed; that they knew their associations must be in position to openly and publicly represent that their depositors' accounts were insured in order to attract deposits and to compete with other savings and loan associations whose deposit accounts were insured; that insurance purportedly provided by International Guaranty and Insurance Company (of Morocco) and next by Financial Guaranty and Insurance Co. (also of Morocco) was not approved by the Utah Insurance Commissioner; that Grow, Mensik, McGurren, and others were responsible for the creation, organization, and operation of SFIC under the circumstances and in the manner as hereinbefore shown; and that SFIC was created for the ostensible purpose of replacing Financial Guaranty and Insurance Co. as insurer of deposits primarily in savings and loan associations owned and controlled by Grow and Mensik. Further insight into the nature of the alleged scheme to defraud may best be gleaned from the court's explanation to the jury of the charges contained in the indictment. The court told the jury that it was "part of the scheme and artifice to defraud and obtain money and property by means of false or fraudulent pretenses, representations, and promises and in furtherance thereof that the six defendants named through the preparation and distribution of brochures, specimen insurance policies, advertising, leaflets, financial statements, newspaper advertising and correspondence, would and did make, cause to be made and approved the making of the following false and fraudulent pretenses, representations and promises, well knowing at the time that said pretenses, representations, and promises would be false and fraudulent when made." The court further spelled out and explained to the jury that

the four such fraudulent pretenses, representations, and promises charged as follows:

(1) That SFIC was dedicated to guarantee the safety of the savings in the institutions that it insured;

(2) That associations insured by SFIC earned the right to acquire insurance from SFIC by meeting high standards of financial responsibility required and enforced by SFIC;

(3) That associations insured by SFIC were required by it to maintain high standards of financial responsibility and were therefore financially sound;

(4) That SFIC, by requiring insured associations to submit to it monthly reports and periodic examinations and audits conducted on behalf of SFIC, exercised strict supervision over financial practices and operating procedures of associations insured by SFIC.

### The Conviction of Grow on Count 3

The indictment charges that the scheme to defraud was devised on or before June 16, 1959, that date being within the period when the plans for the creation of SFIC were being developed and pursued. However, according to the court's holdings, assertedly based on the evidence, Grow's complicity, if any, in the scheme consisted of his "adherence" to a scheme previously devised. As shown, the court directed a verdict in favor of both Grow and Mensik on Count 1 of the indictment which count was based on a letter prepared by Culver for SFIC containing alleged misrepresentations and mailed out by Culver on October 28, 1959. The court said:

"In Count 1 I am satisfied that Mr. Culver, of course, sent the letter out. I am satisfied that the scheme became a scheme to make false advertising no later than that date [October 28, 1959] because Mr. Culver sent out the misrepresentation letter on that date, but I find no evidence that Mr. Mensik or Mr. Grow had adhered to the false advertising aspects of the scheme at the time the Count 1 letter was sent in October, 1959. Therefore, I will direct a verdict for both defendants on Count 1."

Count 2 charged all defendants with the mailing of a letter dated November 27, 1959, but the court found no evidence of the adherence to the false advertising aspects of the scheme by either Grow or Mensik at the time of such mailing.

Count 3 charged all the named defendants with mailing a letter on or about April 9, 1960, addressed to "Mr. and Mrs. Lillian I. Summers" in Romulus, New York, with which was enclosed one of the question-and-answer brochures. The letter is reproduced below.[11] The letter

---

11. 250 South Washington Street, Baltimore 31, Maryland Since 1896
 First Fidelity Savings & Loan Association

Mr. & Mrs. Lillian I. Summers April 9, 1960
North Depot Activity
Romulus, New York

Dear Mr. & Mrs. Summers:

 We have from time to time had numerous inquiries about savings insurance. Members who have visited our offices have remarked that the enclosed statements are most helpful in explaining the workings of such protection. Account insurance plus modern and progressive management amply guarantee the safety of your funds at First Fidelity.

 Of [sic] occasion, we will send you information, as this is to give you a better picture of what your Officers are doing in the management of your money.

 It is pertinent to note that progress in this, our sixty fourth year, is beyond the Officers expectations. Your confidence has made this possible and the management pledges that it will continue to do its' [sic] utmost in your behalf.

was signed by "First Fidelity Savings & Loan Assn. Harold G. Applegarth, President."

■ One element of the offense defined by the mail fraud statute is that the mailing must be for the purpose of executing the fraud. Kann v. United States, 323 U.S. 88, 95, 65 S.Ct. 148, 89 L.Ed. 88 (1944). Significantly, Grow alone was convicted on this count, presumably because of his personal connection with the ownership and control of First Fidelity. Mensik was acquitted. Certainly there was no evidence that Grow himself mailed the letter. If the conviction on this count is to stand it must be on the theory that Grow directed Applegarth to mail the letter or that Grow was responsible for the act of one of his fellow participants "in furtherance of the scheme if committed during the existence of the scheme and his participation therein." Applegarth was not named in the indictment as a defendant, nor was he criminally charged with having devised or having participated in the scheme.

■ In an effort to show that Grow was familiar with the question-and-answer brochure, which contained the allegedly false representations, at the time of the mailing offense charged in Count 3, Mrs. Boulay, who was secretary to Culver, president of SFIC, testified that the brochures were first received by SFIC around March 31, 1960. She identified copies taken from SFIC files of certain one-sentence letters, all dated April 11, 1960, which she wrote advising of the shipment of a supply of the brochures to each branch of Grow's Idaho and Prudential (of Idaho) associations. Each letter began with the salutation "Gentlemen," and indicated that "As requested by Mr. Grow" she was sending a supply of the brochures by Railway Express. The court ruled that these letters and bills from the express company were admissible to prove that material was sent, but added:

"If you want to show that they were sent at the request of Mr. Grow, you will have to produce someone to say they were."

Upon interrogation and cross-examination, Mrs. Boulay could not testify from personal knowledge as to the receipt of any such request from Mr. Grow. Nor was any other witness produced who testified to such request. There was no evidence, other than Mrs. Boulay's letters noted above, pointing to the fact that Grow knew of the existence of the question-and-answer brochures by April 11, 1960. There may have been room to suspect that Grow then had such knowledge, but mere suspicion is not to be substituted for evidence. No letters from Grow or his associations were produced which would indicate a request for such brochures, and Mrs. Boulay testified that at no time did Mr. Grow ever call her and make such a request. There is no evidence that Culver or Mrs. Boulay sent the question-and-answer brochures to Applegarth at First Fidelity with a view to causing him to *mail* them to prospective or existing depositors. There is no evidence that Grow, up to that time, had ever discussed these brochures with Applegarth, with any of the defendants, or with any other person. Consequently, there being no evidence that Grow him-

With pride, I would like to point out that the Association's dividends have always compared favorably with others. The dividend this June will continue to be at the rate of 5%.

It has been a pleasure to serve you in the past, and I personally hope that our relationship will grow through the years.

Very truly yours,

FIRST FIDELITY SAVINGS & LOAN ASSN.
HAROLD G. APPLEGARTH, President

Encl.
HGA/db

Each Account Financially Insured to $20,000

self mailed the letter and brochure in question on April 9, 1960, the only basis for finding that Grow caused the mailing is to draw an inference, seemingly wholly unsupported by evidence, that he had something to do with preparing or approving the brochure, or authorized or acquiesced in sending it to the various associations which he owned or controlled with the expectation that the associations, in turn, would mail them out to prospective depositors. There is no showing that any other of Grow's associations at or near that time ever mailed a single question-and-answer brochure or that First Fidelity mailed any, other than the one with Applegarth's April 9, 1960, letter.

The court instructed the jury with respect to Count 3 that they could convict Grow (1) if they found that he *willfully* caused the letter to be mailed by an employee of First Fidelity, or (2) if Grow participated in the scheme and a "fellow participant" caused the mailing. The court further instructed that the jury could consider Culver a "fellow participant" if he and Grow participated in the scheme and that, if Culver distributed the brochure with the knowledge or expectation that it would be distributed by mail, or if such distribution could have been reasonably foreseen by him, "even though not actually intended," the jury could find that Culver caused the mailing.

■■■■ We think this instruction was without proper supporting evidence. An inference is a logical deduction or conclusion from established fact. " * * [C]harges of conspiracy are not to be made out by piling inference upon inference. * * *.[12] When the first or basic inference is impermissibly drawn it cannot thereafter serve to support other inferences upon which a subsequent finding is based.

Furthermore, the court instructed the jury as follows:

"Before you may find that a defendant, including Culver, caused something to be done, you must be satisfied from the evidence that the defendant possessed the capacity, authority or power to occasion another or others to do an act which the defendant might otherwise have done and that the defendant did in fact exercise that capacity, authority or power in the manner alleged in the indictment."

There was no evidence nor was there even a token effort by the prosecution to prove that Culver possessed any capacity whatever at the time of the mailing of the April 9, 1960, letter to cause First Fidelity or Applegarth to do anything. Upon an apparent presumption of such a capacity, acts of Culver were permitted to be ascribed to Grow through Applegarth. It is an impermissible conclusion that the SFIC mailing of the brochures to Grow's Idaho associations on April 11, 1960, could establish that Grow had "adhered" to the false advertising scheme by way of the question-and-answer brochures, and the representations therein, on April 9, 1960. We think it was error to allow the jury to consider whether Grow caused Applegarth to mail the Count 3 letter and the accompanying brochure on April 9, 1960, two days before the brochures were sent even to the Idaho associations.

### The Convictions of Mensik on Counts 6 and 7

Without consideration at this point of certain claims by Mensik of prejudicial errors in connection with his trial, which claims will be discussed infra, we turn to Mensik's convictions on Counts 6 and 7.

Count 6 charges all of the defendants named in the indictment with the mail-

12. Direct Sales Co. v. United States, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). See United States v. Ross, 92 U.S. 281, 283–284, 23 L.Ed. 707 (1875); Wesson v. United States, 172 F. 2d 931, 936 (8 Cir. 1949).

ing of a letter dated March 29, 1961,[13] addressed to Mr. Harold M. Brightbill, R.D. #3, Myerstown, Pennsylvania, with one of the question-and-answer brochures for the purpose of executing and attempting to execute the scheme to defraud. This letter was written on stationery of SFIC and was signed by Albert K. Wood, Assistant Secretary. A copy of this letter is set forth below.

Count 7 charges all of the defendants named in the indictment with the mailing of a letter [14] dated March 30, 1961,

13. Security Financial Insurance Corporation

206, 208 Keyser Building
Baltimore 2, Maryland

Mr. Harold M. Brightbill
R. D. #3
Myerstown, Pennsylvania

March 29, 1961

Dear Sir:

We acknowledge receipt of your letter of March 28 regarding Commercial Savings and Loan Association and confirm the fact that the accounts of this Association are insured by this company to a maximum of $20,000. per shareholder account.

The Associations which we insure are subject to an annual audit by our Certified Public Accountant and in addition, we require them to submit to us monthly a report of their activities. Our examinations of Commercial, together with the monthly reports, indicate that its affairs are in order and we are willing to continue our insurance of its accounts.

We are enclosing herewith one of our "Questions and Answers" brochures, which, together with the foregoing information, we hope will be helpful to you.

Very truly yours,

ALBERT K. WOOD
Assistant Secretary

AKW;cmb
Encl.

—————◆—————

14. Commercial Savings and Loan Association
324 N. Howard Street

Baltimore 1, Maryland

Mr. Gerald C. Jansek
Camdenton, Mo.

March 30, 1961

Dear Mr. Jansek:

Thank you for your letter requesting information about our Association.

Enclosed are Letters of Facts, which will answer the important questions you may have about our Prepaid Accounts, which pay a current dividend rate of 5% and one about our Optional Accounts, paying a dividend rate of 4½%.

Each of our accounts are insured up to $20,000 by a private insurance company, the Security Financial Insurance Corporation, which is licensed and approved by the State of Maryland.

Because our gifts are expensive, we reserve the right to withhold our cost of the gift if more than 30% of the deposit is withdrawn during the first year. Our gifts are shipped pre-paid via Railway Express or Parcel Post, depending upon their size.

We shall be happy to open your account when you are ready to do so.

Sincerely,

H. M. FERRARI
Office Manager

HMF:ab
Encl.

Accounts Financially Insured

addressed to Mr. Gerald C. Jansek, Camdenton, Mo., with one of the question-and-answer brochures and an advertising leaflet of SFIC for the purpose of executing and attempting to execute the scheme to defraud. This was a letter from Commercial Savings and Loan Association, one of Mensik's associations, and was signed by H. M. Ferrari, Office Manager. A copy of this letter is set forth below.

■ Upon a challenge to the sufficiency of evidence to sustain a conviction it is axiomatic that the evidence, whether direct or circumstantial, including reasonable inferences to be drawn therefrom, must be viewed in the light most favorable to the prosecution, and the verdict will be upheld if there is evidence to support it.[15]

It was shown by an abundance of evidence that SFIC was organized for the primary purpose of providing an insurer of depositors' accounts in savings and loan associations owned and operated by Mensik, Grow, and another of the named defendants, Ellicott. When International Guaranty and Insurance Co. (of Morocco) could not provide acceptable insurance Financial Guaranty and Insurance Co. (also of Morocco) was formed and undertook to provide insurance for Mensik and Grow's associations. But it, too, proved to be unacceptable to the Utah Commissioner of Insurance. In the early through the middle part of 1959, Mensik and Boone discussed the formation of the Maryland insurance company, SFIC, and the various steps which were taken and which ultimately resulted in the incorporating and licensing of SFIC in September of 1959 have been outlined herein in sufficient detail. Certainly there was nothing illegal in the formation of SFIC, and the jury was so instructed. It was only one circumstance in a chain of circumstances entering into the devisal and development of the alleged scheme to defraud. It is unnecessary to again recite the evidence, viewed in the light most favorable to the Government, which clearly disclosed the personal interest of both Mensik and Grow in obtaining a marketable insurer for depositors' accounts in savings and loan associations and their participation in the formation of SFIC. Culver's connection with SFIC as president and principal managing officer was effected through Boone and the close contacts and relationships between Boone and Mensik were clearly shown by the evidence. On September 14, 1959, the day on which SFIC was authorized to do business in Maryland, binders of insurance on savings accounts were issued by SFIC to two of Grow's associations and in rapid succession other binders were issued so that by December 1, 1959, four of Grow's associations and two of Mensik's associations were "insured." The binder to Mensik's Commercial Savings and Loan, Baltimore, was issued on December 1, 1959. Mensik had told his close associate, Suchman, that they did not want to get this insurance right away because people would accuse them "of being connected with the insurance company." These binders were issued without any audits or examinations of the insured associations, without any estimate of the risks insured, in some instances without proper applications and without payment of the prescribed initial deposit or qualifying fee. The issuance of the binders was authorized by Boone, the only director physically present at the "meeting," who voted the proxies of two who were obviously "dummy" directors. One of the five directors at that time was a close business associate of Mensik, two were closely associated with Grow (one Grow's brother-in-law), and Boone was one of SFIC's attorneys.

Thus did SFIC begin its operations, issuing its binders of insurance without investigation or information as to possible risks involved and apparently with an attitude of reckless abandon in regard

---

15. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Lowery, 306 F.2d 133 (4 Cir. 1961); Moore v. United States, 271 F.2d 564 (4 Cir. 1959); United States v. Luxenberg, 374 F.2d 241 (6 Cir. 1967).

to the conditions and operations of Grow and Mensik associations. As hereinbefore shown, the court concluded that the scheme became a "scheme to make false advertising" no later than October 28, 1959, when Culver sent out from SFIC the misrepresentation letter mentioned in Count 1; but the court found no evidence that Mensik or Grow had adhered to the scheme at that time or on November 27, 1959, when the letter mentioned in Count 2 was mailed. Subsequently, after the evidence disclosed that the question-and-answer brochures were sent to Grow's two associations in Idaho on April 11, 1960, and to Mensik's associations on March 31, 1960, the court announced:

> "I now have ruled that there is sufficient evidence that both Mensik and Grow adhered to this alleged scheme by April 11 in one case, and March 31 in the other, which is within all but the first two [as alleged in Count 1 and Count 2] of your mailings."

Soon after the question-and-answer brochure was prepared, Mensik told Suchman (who was then president of Mensik's Commercial Savings and Loan) that he liked the way the brochure was written and directed Suchman to send it out for Commercial in response to inquiries concerning SFIC. One of the brochures was sent by mail with SFIC's letter of March 29, 1961, which letter was written in response to a letter of inquiry concerning Commercial and one of the brochures was sent by mail with Commercial's letter of March 30, 1961, which was in response to a letter received by Commercial itself which contained a request for information "about" that association.

Mensik alone was convicted on Counts 6 and 7 drawn under the mail fraud statute and based upon the mailing of the letters of March 29, 1961, and March 30, 1961, and the brochures sent therewith. Mensik's dominant control over the operations of Commercial was conclusively shown by the testimony of Suchman. Furthermore, the evidence disclosed Mensik's close contacts with and his influence over Culver, his intimate knowledge of the manner in which the affairs of SFIC were being conducted and its operations in general. Unfavorable reports of operations of some of the Grow and Mensik associations insured by SFIC were presented to Mensik by Aiken, SFIC's accountant, and were considered and discussed with Aiken by Mensik. The expenses of Aiken to Chicago for conferences with Mensik were paid by SFIC.

According to the evidence, as early as January 1959, Grow, Mensik and McGurren met with Applegarth in Chicago (Mensik and his Commercial Savings and Loan then had been indicted in Maryland for mail fraud) and both Grow and Mensik laid bare their troubles, Grow's in Utah and Mensik's in Chicago and Maryland. It was then that Applegarth was employed to acquire charters of old Maryland savings and loan associations which could show a record of operations over a long period of time and convert them into new associations with changes of names. It was obvious that both Grow and Mensik desired to conceal their ownership of and connection with their newly acquired associations in Maryland. From the evidence it could not be doubted that Grow and Mensik knew of the advertising methods and practices of SFIC, its mailing campaign, and the distribution of advertising material to and among the associations whose deposits SFIC purported to insure. Included in this material were the question-and-answer brochures containing the representations with respect to SFIC's operations and the operations of their insureds. From all the evidence of facts and circumstances and the inferences to be drawn therefrom there was ample proof of the existence and continuation of the scheme to defraud and obtain money by means of false advertising and by misrepresentations, the active execution and operation of the scheme by Culver and others, the knowledge thereof, the adherence thereto, and the participation therein of both Grow and Mensik at the time of the mailing of the letters and enclosures as charged in Counts 6 and 7. The evidence provided adequate support

for the inference that the successful execution of the scheme would necessarily involve the use of the mails in distributing the question-and-answer brochures in response to inquiries with respect to SFIC or its insured associations and that the parties to the scheme must have known that the United States mails would be used in furtherance of the scheme.

In charging the jury with respect to Count 6, the court said: "It is not necessary that Grow or Mensik, as the case may be, actually mailed the letter or directed that it be mailed." This was the letter of March 29, 1961, to Mr. Brightbill from Albert K. Wood as assistant secretary of SFIC. The court continued: "Take the case of Grow, for example. If you find that both Grow and Culver knowingly and willfully participated in the alleged scheme, Grow may be considered to have caused the mailing if Culver willfully caused the letter to be mailed by an employee of SFIC. The same is true for Mensik.

With respect to the mailing charged in Count 7, which was the letter of March 30, 1961, to Mr. Jansek from H. M. Ferrari, as office manager of Commercial Savings and Loan Association, the court instructed the jury:

"It is not necessary that Grow or Mensik, as the case may be, actually mailed the letter or directed that it be mailed. Take the case of Mensik, for example. It is sufficient if he willfully caused the letter to be mailed by an employee of Commercial Savings and Loan Association in the ordinary course of business; or if you find that Mensik knowingly and willfully participated in the alleged scheme he may be considered to have caused the letter to be mailed if a fellow participant in the scheme willfully caused the mailing by an employee of Commercial. If you find that both Mensik and Culver knowingly and willfully participated in the scheme, you may find that Culver

was a fellow participant; and if you find that Culver distributed to Commercial Savings and Loan Association any of the material enclosed in the letter with the knowledge that it would be distributed by mail to prospective depositors in the ordinary course of business, or if such use could reasonably have been foreseen by him, even though not actually intended, then you may find that Culver [a fellow participant] caused the mailing."

██ The nature of proof in a scheme to defraud, involving two or more persons, is analogous to the nature of proof in a conspiracy. The acts and declarations of each party to the scheme made in furtherance or execution thereof are admissible against all.[16] Permissibly, and adopting language favorable to the defendants, the court told the jury, in effect, that they could not consider the acts and declarations of coconspirators unless they found that the defendants were participants in the scheme from independent evidence as to each.

██ Mensik and Grow owned and controlled their Maryland savings and loan associations and SFIC through others, remaining once or twice removed from records and operations. But a substantial part of the Government's proof was the direct testimony of the men to whom Mensik and Grow gave orders and instructions—Applegarth, Suchman, Phelps, Rosche, and others. Their testimony as to acts and declarations of Mensik and Grow as well as acts and declarations of Boone, Ellicott, and Culver, which we find to be admissible in evidence over the objection of the defendants, tended to support the Government's position that Mensik and Grow joined, participated in and adhered to the scheme and its execution. There was ample proof to sustain the Government's contention that Grow and Mensik knew that the question-and-answer brochure would be sent by mail by their own controlled savings and loan associations, by

16. See Blue v. United States, 138 F.2d 351 (6 Cir. 1943), cert. denied, 322 U.S. 736, 64 S.Ct. 1046, 88 L.Ed. 1570; United States v. Sapperstein, 312 F.2d 694 (4 Cir. 1963); Kumpe v. United States, 250 F.2d 125 (5 Cir. 1957); Robinson v. United States, 33 F.2d 238 (9 Cir. 1929).

SFIC through Culver and at his direction, all in the ordinary course of business, that the brochure contained misrepresentations which, if true, were calculated to induce depositors in the insured associations to maintain their deposits or prospective customers to deposit their funds in said associations.

### Objections to Evidence

As the court told the jury, consistent with the theory of the prosecution, proof that at least one of the representations was, in fact, false and that the defendants Grow and Mensik knew it to be false, was essential to their convictions. To this end, much material was introduced in evidence by the Government to show matters which were brought to the attention of Culver and SFIC but not for the purpose of proving the truth of the contents of such material. The prosecution was proceeding upon the premise that if SFIC received material containing information concerning the poor financial condition or the mismanagement of its various insured associations, irrespective of the truth of the contents of such material, the receipt of such information proved the alleged misrepresentations made principally through the distribution of the question-and-answer brochures and the knowledge thereof by the participants in the scheme.

The brochures represented that SFIC was dedicated to guaranteeing the safety of savings in its insured associations and that depositors who placed funds in the associations insured by SFIC were protected by annual examinations by SFIC of the insured institutions, by security found in real estate mortgages, U. S. Government bonds and other assets, by sound progressive operating policies of the insureds, and finally by insurance against loss provided by SFIC.

The defendants assert that certain documents offered by the Government and admitted by the court as relevant to prove knowledge, intent and material facts in issue (about which the jury was cautioned both at the admission stage and in the court's charge) were hearsay because they were actually admitted for the truth of the statements and assertions contained therein. One such document was a report of an accounting examination of Grow's Utah Savings and Loan Association conducted by SFIC's regular accountant, Aiken, in early 1960. The report was identified by Aiken who testified that he sent the report to SFIC and discussed it with Culver. Culver remembered numerous discussions with Aiken concerning reports of examinations and in attempting to fix a date recalled receiving Aiken's Utah report about April of 1960. Another document introduced by the Government was identified by Aiken as a copy of a portion of the Utah State Banking Commissioner's report on Utah Savings and Loan Association dated March 12, 1959. He testified that he saw the copy in the files of SFIC prior to going to Utah in January of 1960 and discussed it with Culver. Aiken further testified that the Commissioner's report was made available to him while he was examining Utah Savings and Loan Association during January and February of 1960. Another document was identified by Culver and this was a letter dated April 4, 1960, from an attorney, Gilmour, concerning the progress of obtaining a license for SFIC to do business in the State of Utah. Gilmour had been hired by SFIC to assist in procuring the license after Grow had insisted that it was necessary for SFIC to be licensed in Utah so that he could advertise there the fact that the depositors in his association were insured. Culver testified that he discussed this specific letter with Grow within a month of its receipt. The import of the information in all three documents was that Utah was in precarious financial condition and had been in that condition for some time, largely due to mismanagement by Grow. Culver testified that he discussed the reported conditions in Utah Savings and Loan with Grow every time he saw Grow, and that he also discussed these conditions with Mensik. Grow's reply was that he was trying to work it out. Mensik's reply was that he would talk to Grow and he said, in effect, that he knew that Grow had been having troubles.

These documents and others in this class were offered to prove the communication of information to officers and directors of SFIC or the receipt of such information by them, and not to prove that Utah Savings and Loan Association or others were, in fact, in a precarious condition.

■ The hearsay rule by its definition is inapplicable. Here this evidence was admissible to show a circumstance relevant to the proof of a material fact, i. e., the state of mind of officers and directors of SFIC in issuing and renewing binders of insurance.[17] Within these same principles the evidence was also admissible to show that such information received by SFIC was concealed from the depositors and prospective depositors in the insured savings and loan associations as charged in the concealment paragraph of the indictment.

The admission into evidence of reports maintained, kept on file and used by SFIC is also challenged. The "Monthly Report" was a form printed by SFIC and distributed to insured savings and loan associations. It was required that each association submit this report monthly and the entries thereon were certified by the signer, an officer of the association, to have been taken from the books and records of the savings and loan association. Entries as to assets, current expenses, total free share accounts, current income, etc., were reported. This form was particularly used to verify the monthly premium payment of the insured association since such premiums were based on a percentage of the total amount of "withdrawals or free share accounts" annually, payable monthly. Mrs. Boulay, Culver's secretary, computed the premiums due on the form and Culver, as president, initialed the verification.

These Monthly Reports were routinely and regularly kept by SFIC in a special file maintained as to each insured association.

■ The test of admissibility under Title 28, § 1732, is not that the party making the entry must identify and explain the document, but rather that the record must carry with it some guarantee of trustworthiness. Admissibility is to be determined by the character of the records and their earmarks of reliability acquired from their source and origin and the nature of the compilation.[18] We think that the guarantee of trustworthiness was established by the above facts.[19]

Mensik and Grow assert that they did not personally mail any of the letters mentioned in the counts on which they were convicted and that the evidence was insufficient to show that they "caused" them to be mailed. In passing upon the admissibility of evidence with respect to causing the mailings and in charging the jury, the court relied heavily upon the teachings of Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

■ "The elements of the offense of mail fraud under 18 U.S.C. * * * § 1341, are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme. It is not necessary that the scheme contemplate the use of the mails as an essential element. United States v. Young, 232 U.S. 155, [34 S.Ct. 303, 58 L.Ed. 548]. Here, the scheme to defraud is established, and the mailing of the check by the bank, incident to an essential part of the scheme, is established. There remains only the question whether Pereira 'caused' the mailing. That question is easily

17. Hicks v. United States, 173 F.2d 570 (4 Cir. 1949), cert. denied, 337 U.S. 945, 69 S.Ct. 1501, 93 L.Ed. 1748; Frank v. United States, 220 F.2d 559 (10 Cir. 1955). See also United States v. Perkins, 286 F.2d 150 (6 Cir. 1961); Sica v. United States, 325 F.2d 831, 835–836 (9 Cir. 1963), cert. denied, 377 U.S. 953, 961, 84 S.Ct. 970, 11 L.Ed.2d 972.

18. Hartzog v. United States, 217 F.2d 706, 710 (4 Cir. 1954).

19. See also United States v. Norris, 205 F.2d 828 (2 Cir. 1953); United States v. Quong, 303 F.2d 499, 504 (6 Cir. 1962), cert. denied, 371 U.S. 863, 83 S. Ct. 119, 9 L.Ed.2d 100; Mende v. United States, 282 F.2d 881, 884 (9 Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365.

answered. Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used. * * *." 347 U.S. at 8 and 9, 74 S.Ct. at 362.

There were other objections to the admission of evidence made by and on behalf of the individual defendants on trial including McGurren while he remained in the case as a defendant. These objections are almost countless and abound throughout the thousands of pages of the transcript of the trial proceedings and the testimony. Suffice it to say that we have examined this record in its entirety, a procedure which has been terribly time consuming and, on occasions, most frustrating and discouraging because of the exhaustive search necessary to follow up on the ultimate rulings on objections and the admission of testimony and exhibits. It would be impossible to discuss each and every such objection and the disposition thereof. We have reached the conclusion that some of the objections were utterly frivolous and without semblance of foundation. The court exhibited unlimited patience and demonstrated throughout the trial a real concern for the rights of the defendants and a determination to assure a fair submission of their cases for jury decision.

### The Convictions of Grow and Mensik on Count 8

Count 8 charges all of the defendants named in the indictment with the mailing of a letter dated June 19, 1961,[20] ad-

---

20. Security Financial Insurance Corporation
206–208 Keyser Building, Baltimore 2, Maryland

Mr. Thomas F. O'Connell June 19, 1961

34 Killmurray Street
Clinton, Massachusetts

Dear Mr. O'Connell:

In reply to your letter of June 16, the accounts of the Prudential Savings and Loan Association and Commercial Savings and Loan Association are insured by this company to a maximum of $20,000.00 per shareholder account. Our certified public accountant performs an annual audit on each Association we insure and in addition, we require each insured Association to submit to us a monthly report of its activities. Our examinations of the Associations in question, together with the monthly reports which they send us, indicate that their affairs are in order and we are willing to continue our insurance of their accounts.

We are enclosing for your information a specimen copy of our Shareholders Guarantee Policy, our financial statement as of December 31, 1960, and a brochure giving information regarding savings insured by Security Financial.

Very truly yours,

[Signed] ALBERT K. WOOD
AKW:cmb Albert K. Wood
Encls. Assistant Secretary

The foregoing letter was in response to a letter received by SFIC from Thomas F. O'Connell which is reproduced below.

34 Killmurray St.
Clinton, Mass.

Security Financial Ins. Corp. June 16/61

Dear Sirs:

I am checking on the reliability of the Prudential Savings and Loan Assn., 31 W. North Ave. Baltimore 1, also the Commercial Savings and Loan Assn., 334 North Howard St. I am interested in opening an account with one or both but would like to know more about them from some other interested party.

Thanking you for any information you may be able to give me

Your Truly
Thomas F. O'Connell

dressed to Mr. Thomas F. O'Connell, 34 Killmurray Street, Clinton, Massachusetts, containing a specimen copy of a Shareholder's Guarantee Policy of SFIC, a financial statement of SFIC as of December 31, 1960, and one of the question-and-answer brochures, for the purpose of executing and attempting to execute the scheme to defraud. Both Grow and Mensik were convicted on this count.

In the foregoing portions of this opinion we have undertaken to outline the evidence relating to the formation and development of the scheme to defraud, the participation of Grow and Mensik in the scheme, their adherence thereto, their knowledge and approval of the widespread and continuing use of the mails in distributing the material containing false representations and concealing information as charged in the indictment.

 The scheme was well under way and in full bloom in June of 1961 at the time of the mailing of the O'Connell letter and the enclosures therewith. Evidence of facts and circumstances existing at that time not only supports but also compels the inference that the O'Connell letter was prepared and mailed in the usual course of SFIC's business by Albert K. Wood, Assistant Secretary of SFIC, under the supervision and pursuant to the directions of Culver who was a participant with Grow and Mensik in the furtherance of the continuing scheme. We think the evidence clearly sufficient to support the guilty verdict returned by the jury against both Grow and Mensik on Count 8.

### Other Assignments of Error

Grow contends that he was convicted on Count 8 by reason of an honest but clear mistake of fact on the part of the jury. He argues that from an analysis of the verdict on each of the counts numbered 3 through 9 submitted to the jury (Counts 1 and 2 were dismissed), it is apparent that the guilt or innocence of a particular defendant was determined by whether the mailing involved was by or on behalf of an association or associations assertedly dominated and controlled by one or the other of the defendants. It is true that on Count 3 Grow was found guilty and Mensik not guilty where the mailing was by First Fidelity Savings and Loan Association, assertedly dominated and controlled by Grow; on Count 6 Mensik was found guilty and Grow not guilty where the mailing, by SFIC, was on behalf of Commercial Savings and Loan Association, assertedly dominated and controlled by Mensik; on Count 7 Mensik was found guilty and Grow not guilty, where the mailing was by Commercial, assertedly dominated and controlled by Mensik; on Count 8 both Grow and Mensik were found guilty, where the mailing was on behalf of Commercial, assertedly dominated and controlled by Mensik, and Prudential Savings and Loan Association. Grow points to the fact that it was alleged, and evidence was presented to show, that he dominated and controlled Prudential Savings and Loan Association *of Idaho,* whereas the Count 8 mailing by SFIC was on behalf of Prudential Savings and Loan Association *of Baltimore* with which Grow was not identified. On Count 9 both Grow and Mensik were found not guilty where the mailing was by a savings and loan association not alleged to have been dominated or controlled by either Grow or Mensik.

In consideration of what was characterized as a "manifest mistake," and within two days after the verdict, Grow moved that the court authorize counsel, in conjunction with the office of the United States Attorney, to interview or take the depositions of a representative number of the jurors to determine whether a mistake of fact occasioned the conviction of Grow on Count 8, and, thereafter, depending upon the results, to grant appropriate relief. It is contended that the court erred in denying the motion.

 Grow's contention that the verdict against him on Count 8 was based upon a clear mistake of fact *assumes* that the jury intended to convict only as to mailings shown to be related to associations controlled by the defendants. This

assumption, however, is pure speculation. Neither under the court's charge, nor under the law of mail fraud as applied to the facts in this case, would the jury be required to find the defendants guilty on only those counts involving associations which they controlled. In order to find Grow guilty on Count 8 it was not necessary that the jury find that Grow controlled either Commercial or Prudential. To speculate that the jury did so find is to speculate as to the jury's reasoning which is unwarranted as a method of impeachment of the verdict. In Butler v. United States, 317 F.2d 249 at 262 (8 Cir. 1963), it was stated that "[A] juror's testimony revealing the reasons that in fact induced him or other members of the jury to arrive at their verdict cannot be admitted as impeachment testimony." The thrust of Grow's contention is that his conviction on Count 8 cannot stand because it is inconsistent with the jury's disposition of other counts. However, consistency in the verdict is not necessary.[21]

 Grow further complains that he was prejudiced because of the denial of his motion for a separate trial; that Mensik's opening statement to the jury, when Mensik was undertaking to represent himself, was replete with irrelevant allegations grossly prejudicial to Grow; that Mensik created and maintained an explosive atmosphere very detrimental to Grow; and that the court erroneously permitted Mensik to elicit the information from Culver on cross-examination that he, Culver, had changed his original plea of "not guilty" to "nolo contendere." We find no abuse of discretion on the part of the trial judge in denying a severance and no error in permitting the disclosure of Culver's change of plea.

Mensik complains that he was deprived of his constitutional right to be present at every stage of the trial, including the impaneling of the jury, that he was prejudiced by being forced to proceed to trial without counsel, and that he was prejudiced in his defense by the court's remarks and remonstrations. Since these complaints are based upon situations which developed at different stages of this litigation, it appears necessary to briefly note the pertinent facts and circumstances.

Attorney Edward J. Calihan, of Chicago, entered his appearance for Mensik on March 1, 1963. It was not until October 28, 1963, at the commencement of the Richmond *voir dire* that Mensik first notified the trial court of the purported "discharge" of Calihan. During this period Calihan had actively represented Mensik in connection with numerous pre-trial motions, extensive hearings, the selection of a jury in Baltimore, and the proceeding on October 24, 1963, at which Judge Thomsen granted the motion to transfer the trial to Richmond. Mensik asserts that a "growing disagreement" between him and Calihan was made known to the court on October 16, 1963, but we find nothing in the record to support this charge. Mensik further claims that on Friday, October 25, 1963, while still in Baltimore, he asked for a continuance because of the disagreements he theretofore had with his counsel but, according to the record, he did not ask for a continuance on that date and did not even advise the court of the so-called "impasse" until the following Monday, October 28, which was the day of the commencement of the Richmond *voir dire*.

On October 28 Mensik stated to the the court: "Mr. Calihan is not my counsel and in the absence of counsel to be selected by me here in Richmond, I will act as my own counsel." The court refused to excuse Calihan until Mensik should select one of several arrangements proposed by the court. These were as

---

21. Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932); United States v. American Stevedores, Inc., 310 F.2d 47 (2 Cir. 1962), cert. denied, 371 U.S. 969, 83 S.Ct. 552, 9 L.Ed. 2d 539 (1963); United States v. Crosby, 294 F.2d 928, 952 (2 Cir. 1961), cert. denied, Mittleman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 583 (1962); Steckler v. United States, 7 F. 2d 59, 60 (2 Cir. 1925).

follows: (1) Defend pro se; (2) defend pro se with Calihan's advice; (3) complete representation by Calihan; (4) new counsel to assist Calihan; or (5) new counsel to replace Calihan and to proceed without delay. Mensik ultimately elected a combination of these extended choices. He authorized Calihan to conduct the *voir dire* in his absence and to perform certain other tasks and he acted pro se with the assistance of new counsel, Mr. James, during the trial.

Mensik complains that his motion for a continuance was denied and that the court insisted that the case go to trial forthwith. As early as July 12, 1963, a firm trial date of September 16, 1963, had been set. Shortly before that date a petition of counsel for McGurren for permission to withdraw as such counsel was denied. On September 16, Judge Thomsen advised counsel that "This case is a pending case and must take precedence over all other matters in which counsel are engaged," and that the court would not permit withdrawal of counsel at the last moment "to be used as an excuse for the postponement of this case." As late as September 24, 1963, when matters were under consideration with respect to the removal of the trial to Richmond and the appointment of Judge Thomsen to preside over the Richmond trial, Mensik stated to Judge Sobeloff: "I just leave it rest with my attorney at this point."

Although the attorney-client relationship is ordinarily a private matter, a defendant does not have the unbridled right to discharge counsel *on the eve of trial.* Calihan had represented Mensik in a previous savings and loan mail fraud prosecution which had lasted for a considerable period of time. He had represented Mensik before the Tax Court. He had represented Mensik in the instant case for eight months and was present in the courtroom, "prepared to defend the case on the merits." No plausible reason has been offered which would have warranted a delay. Actually, Mensik chose

not to give any specific explanation of his dissatisfaction with counsel, and under such circumstances the court would have been justified in compelling Calihan to remain as counsel for the entire trial. United States v. Paccione, 224 F.2d 801, 802 (2 Cir. 1955) cert. denied, 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788.

After the district court had denied Calihan's motion to be relieved as counsel, Calihan filed a petition for a writ of mandamus in this court to require the district court to allow him to withdraw as counsel. It appeared that Attorney James had then been retained as counsel to assist Mensik at the trial and upon representations made by Mensik, Attorney James, Judge Thomsen, and counsel for the United States, the petition for writ of mandamus was dismissed and Calihan was permitted by Judge Thomsen to withdraw from further representation.

In order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances. United States v. Mitchell, 138 F.2d 831 (2 Cir. 1943), cert. denied, 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 1083. Mensik had merely implied that Calihan had intentionally deserted and abandoned him, but the record supports no such implication. Calihan had advised this court that the roots of the difficulty were grounded in Mensik's dissatisfaction with the assignment of Judge Thomsen to preside at the Richmond trial and Calihan's refusal to strenuously object to such assignment. This circumstance would not provide adequate cause to delay proceedings. Every circumstance, whether isolated or joined, would compel the view that the trial court properly exercised discretion reasonably necessary to meet the situation. The denial of a motion for a continuance under the circumstances presented was not an abuse of discretion.[22]

22. See Isaacs v. United States, 159 U.S. 487, 489, 16 S.Ct. 51, 40 L.Ed. 229 (1895); Torres v. United States, 270 F. 2d 252, 254–255 (9 Cir. 1959); Couchois v. United States, 142 F.2d 1 (5 Cir. 1944.)

Mensik was not present at the Richmond *voir dire,* but it is clear from the record that he was intentionally and voluntarily absent and that he was then represented by Calihan. On other occasions Calihan and James had expressly waived Mensik's presence and it clearly appears that they had been specifically authorized by Mensik to do so. On one occasion during the trial Mensik, in a telephone colloquy with the court, expressly waived his right to be present, the court explicitly and repeatedly advising Mensik of his right to be present at every stage of the trial. On several occasions throughout the trial Mensik himself, or through his counsel, sought and was granted permission to be absent. After this court had denied the petition for mandamus, the trial court entered an order in which it was recited that Mensik "desires to conduct his own defense, with the advice of Mr. James, unless and until Mr. James decides, during the progress of the case, that he is willing to accept full responsibility from there on." Both Mensik and Attorney James indicated approval of this order, each in his own handwriting.

This entire situation was a creature of Mensik's conduct and he now protests that he was treated unfairly in the circumstances which he himself deliberately created and expressly approved. He complains that James' lack of familiarity with the case is a ground for reversal. Having elected, for undisclosed reasons, to refuse to continue to accept the services of Calihan after approximately eight months of active representation, and having elected to proceed pro se with the advice of substitute counsel, we reach the conclusion that Mensik is in no position to complain of a situation for which he was intentionally and knowingly responsible. As the Government points out in its brief, relying upon United States v. Redfield, 197 F.Supp. 559 (D.Nev.1961), aff'd per curiam, 295 F.2d 249 (9 Cir. 1961), cert. denied, 369 U.S. 803, 82 S.Ct. 642, 7 L.Ed.2d 550 Mensik "is incorrect in his assumption that Sixth Amendment rights have been newly-wrapped in a climate which affords a defendant the right to obtain a delay at his whim and caprice, or to obtain a reversal because he was unable to frustrate justice."

The remarks and remonstrations addressed by the court to Mensik were clearly justified in the circumstances.

Additional assignments of error are, in part, as follows: (1) The denial of the defendants' motion to dismiss the indictment on the grounds that it was vague, indefinite, duplicitous, and otherwise insufficient; (2) the denial of a motion in arrest of judgment based upon the same grounds; and (3) the denial of defendants' motion to suppress certain evidence alleged to have been illegally obtained.

These and other asserted pre-trial errors were fully considered by the district court and disposition thereof was made in an exhaustive and well-considered opinion in United States v. Culver [Boone, Grow, Mensik and McGurren], 224 F.Supp. 419 et seq. (D.Md.1963). As to these assignments of error we affirm the action of the district court for the reasons stated in its able opinion as cited above.

Other errors alleged to have occurred during the trial have been carefully considered and found to be without merit.

The conviction of Grow on Count 3 is reversed.

The conviction of Mensik on Counts 6 and 7 is affirmed.

The conviction of Grow and Mensik on Count 8 is affirmed.

## APPENDIX A

(Caption omitted)

The Grand Jury for the District of Maryland charges:

1. That at all times as hereinafter mentioned the following facts existed:

(a) Security Financial Insurance Corporation was a corporation which was incorporated under the laws of the State of Maryland on July 30, 1959 and licensed to do business in Maryland as an insurance company on September 14, 1959.

During the period September 14, 1959 until on or about July 27, 1962, it was engaged in the business of issuing binders and policies of insurance on savings accounts in savings and loan associations.

(b) The defendant Charles F. Culver was an incorporator of Security Financial Insurance Corporation, was president of Security Financial Insurance Corporation from on or about July 31, 1959 until on or about July 18, 1961 and was a director of Security Financial Insurance Corporation from on or about December 15, 1959 until on or about July 18, 1961.

(c) The defendant A. Gordon Boone was an incorporator of Security Financial Insurance Corporation, was a director of Security Financial Insurance Corporation from on or about July 30, 1959 until on or about July 18, 1961 and acted as attorney for Security Financial Insurance Corporation from on or about July 30, 1959 until on or about July 18, 1961.

(d) The defendant J. Thomas Ellicott was an incorporator of Security Financial Insurance Corporation, was a director of Security Financial Insurance Corporation from on or about July 30, 1959 until on or about July 31, 1959 and acted as attorney for Security Financial Insurance Corporation from on or about July 30, 1959 until on or about January 8, 1962. The defendant J. Thomas Ellicott dominated and controlled the business and affairs of the following savings and loan associations during the periods indicated below:

First Union Savings and Loan Association, Inc., a Maryland corporation, from on or about February 14, 1960 and continuing until on or about July 24, 1962.

Monumental City Savings and Loan Association, Inc., a Maryland corporation, from on or about August 24, 1960 and continuing until after July 27, 1962.

(e) The defendant C. Oran Mensik dominated and controlled the business and affairs of the following savings and loan associations during the periods indicated below:

Commercial Savings and Loan Association, Inc., a Maryland corporation, from prior to June 16, 1959 and continuing until on or about June 13, 1962.

Maryland Thrift Savings and Loan Association, Inc., a Maryland corporation, from on or about September 21, 1959 and continuing until after July 27, 1962.

First Financial Savings and Loan Association, Inc., a Maryland corporation, from on or about November 9, 1959 and continuing until on or about July 27, 1962.

Maryland Financial Savings and Loan Association, Inc., a Maryland corporation, from on or about November 9, 1959 and continuing until after July 27, 1962.

First General Savings and Loan Association, Inc., a Maryland corporation, from on or about November 20, 1959 and continuing until after July 27, 1962.

Maryland District Savings and Loan Association, Inc., a Maryland corporation, from on or about December 7, 1959 and continuing until on or about May 24, 1962.

(f) The defendant D. Spencer Grow dominated and controlled the business and affairs of the following savings and loan associations during the periods indicated below:

Utah Savings and Loan Association, Inc., a Utah corporation, from prior to June 16, 1959 and continuing until after July 27, 1962.

Prudential Savings and Loan Association, Inc., an Idaho corporation, from prior to June 16, 1959 and continuing until after July 27, 1962.

Idaho Savings and Loan Association, Inc., an Idaho corporation, from prior to June 16, 1959 and continuing until after July 27, 1962.

First Fidelity Savings and Loan Association, Inc., a Maryland corporation, from prior to June 16, 1959 and continuing until on or about April 15, 1961.

First Guarantee Savings and Loan Association, Inc., a Maryland corporation,

from on or about June 20, 1960 and continuing until on or about September 29, 1961.

(g) The defendant Henry McGurren was an attorney at law licensed to practice in the State of Illinois.

2. That from on or before June 16, 1959, and continuing until on or about July 27, 1962, the exact dates being to the Grand July unknown, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik, and Henry McGurren did devise and intend to devise a scheme and artifice to defraud any and all persons who were investors in, or could be induced to become investors in, savings accounts of certain savings and loan associations, to wit, those associations which would and did represent to such investors and potential investors that savings accounts were insured by Security Financial Insurance Corporation, and to obtain money and property by means of false and fraudulent pretenses, representations and promises; and it was as a part of said scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and in furtherance thereof that:

(a) On or about July 30, 1959 the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did organize and incorporate Security Financial Insurance Corporation in the State of Maryland.

(b) On or about September 14, 1959 the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did obtain a license from the Insurance Commissioner of the State of Maryland authorizing Security Financial Insurance Corporation to do business as an insurance company in the State of Maryland.

(c) On the same day, September 14, 1959, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued on behalf of Security Financial Insurance Corporation a binder of insurance to First Fidelity Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(d) On the same day, September 14, 1959, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued on behalf of Security Financial Insurance Corporation a binder of insurance to Utah Savings and Loan Association, Inc., purporting to insure the saving accounts in that association against loss.

(e) On or about September 28, 1959, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to Prudential Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(f) On or about September 30, 1959, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to Maryland Thrift Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(g) On or about November 16, 1959, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to Idaho Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(h) On or about December 1, 1959, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to Com-

mercial Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(i) On or about December 28, 1959, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to Maryland District Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(j) On or about January 5, 1960, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to First Union Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(k) On or about January 26, 1960, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to Military Service Savings and Loan Association, Inc., a Maryland corporation, purporting to insure the savings accounts in that association against loss.

(l) On or about May 13, 1960, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to Phoenix Savings and Loan Association, Inc., a Maryland corporation, purporting to insure the savings accounts in that association against loss.

(m) On or about June 28, 1960, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to First Financial Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(n) On or about June 28, 1960, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to First General Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(o) On or about June 30, 1960, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to First Guarantee Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(p) On or about November 15, 1960, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a policy of insurance to Monumental City Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(q) On or about January 18, 1961, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued a binder of insurance to Maryland Financial Savings and Loan Association, Inc., purporting to insure the savings accounts in that association against loss.

(r) From time to time during the period of the aforesaid scheme and artifice, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did issue and cause to be issued binders and policies of insurance purporting to insure against loss the savings accounts in other savings and loan associations organized and incorporated and caused to be organized and incorporated in the states of Utah and Maryland by the defendants D. Spencer Grow and C. Oran Mensik.

(s) The defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did prepare and distribute, cause to be prepared and distributed, and approve the preparation and distribution, by mail and otherwise, of brochures, specimen insurance policies, advertising leaflets, financial statements, newspaper advertisements and correspondence designed and intended by the defendants to lead the investing public to believe that savings accounts in savings and loan associations insured by Security Financial Insurance Corporation were desirable and secure investments because said savings and loan associations were financially sound and strictly supervised by Security Financial Insurance Corporation.

(t) That the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren would and did organize, and cause to be organized, Security Financial Insurance Corporation and would and did exercise, and cause to be exercised, the corporate power and authority of Security Financial Insurance Corporation in order to attract the investment of funds by the investing public to savings and loan associations organized, dominated and controlled and to be organized, dominated and controlled by the defendants J. Thomas Ellicott, D. Spencer Grow and C. Oran Mensik, and thereby to the use, personal gain and benefit of the defendants J. Thomas Ellicott, D. Spencer Grow and C. Oran Mensik.

3. It was a further part of the scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises and in furtherance thereof that the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren, through the preparation and distribution of brochures, specimen insurance policies, advertising leaflets, financial statements, newspaper advertisements and correspondence, would and did make, cause to be made, and approve the making of the following false and fraudulent pretenses, representations and promises, well knowing at the time said pretenses, representations and promises would be false and fraudulent when made:

(a) That Security Financial Insurance Corporation was dedicated to guarantee the safety of savings in the institutions that it insured.

(b) That associations insured by Security Financial Insurance Corporation earned the right to acquire insurance from Security Financial Insurance Corporation by meeting high standards of financial responsibility required and enforced by Security Financial Insurance Corporation.

(c) That associations insured by Security Financial Insurance Corporation were required by Security Financial Insurance Corporation to maintain high standards of financial responsibility and were therefore financially sound.

(d) That Security Financial Insurance Corporation, by requiring insured associations to submit to it monthly reports and by periodic examinations and audits conducted on behalf of Security Financial Insurance Corporation, exercised strict supervision over the financial practices and operating procedures of associations insured by Security Financial Insurance Corporation.

4. It was as a further part of said scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises and in furtherance thereof that the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren, while making the false and fraudulent pretenses, representations and promises referred to in Paragraph 3 above, would and did knowingly and wilfully conceal the following material and qualifying facts:

(a) That Security Financial Insurance Corporation was organized, incorporated and operated by the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Men-

sik and Henry McGurren for the primary purpose of enabling savings and loan associations controlled and dominated and to be controlled and dominated by the defendants C. Oran Mensik, D. Spencer Grow and J. Thomas Ellicott to advertise that savings accounts in said savings and loan associations were "insured".

(b) That Security Financial Insurance Corporation and its officers and directors were continually informed that savings and loan associations insured by Security Financial Insurance Corporation, including those associations dominated and controlled by the defendants J. Thomas Ellicott, D. Spencer Grow and C. Oran Mensik, were being operated in a manner inconsistent with sound financial practices and in a manner which jeopardized the safety and security of the funds invested by investors in savings accounts in those associations.

Title 18, U.S.C., §§ 2 and 1341

## COUNT THREE

1. The Grand Jury for the District of Maryland repeats, realleges and reiterates, with the same force and effect as though set forth at length herein, all of the allegations of Paragraphs 1, 2, 3 and 4 of Count One of this indictment.

2. That on or about the 9th day of April, 1960, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren did, for the purpose of executing the aforesaid scheme and artifice and attempting to do so, place and cause to be placed in an authorized depository for mail matter in the State and District of Maryland to be delivered by the United States Post Office Department a letter addressed to Mr. & Mrs. Lillian I. Summers, North Depot Activity, Romulus, New York, containing a brochure entitled "Questions & Answers about Savings Insured by Security Financial Insurance Corporation". Title 18, U.S.C., §§ 2 and 1341

## COUNT SIX

1. The Grand Jury for the District of Maryland repeats, realleges and reiter-

ates, with the same force and effect as though set forth at length herein, all of the allegations of Paragraphs 1, 2, 3 and 4 of Count One of this indictment.

2. That on or about the 29th day of March, 1961, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren did, for the purpose of executing the aforesaid scheme and artifice and attempting to do so, place and cause to be placed in an authorized depository for mail matter in the State and District of Maryland to be delivered by the United States Post Office Department a letter addressed to Mr. Harold M. Brightbill, R. D. #3, Myerstown, Pennsylvania, containing a brochure entitled "Questions & Answers about Savings Insured by Security Financial Insurance Corporation".

Title 18, U.S.C., §§ 2 and 1341

## COUNT SEVEN

1. The Grand Jury for the District of Maryland repeats, realleges and reiterates, with the same force and effect as though set forth at length herein, all of the allegations of Paragraphs 1, 2, 3 and 4 of Count One of this indictment.

2. That on or about the 30th day of March, 1961, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren did, for the purpose of executing the aforesaid scheme and artifice and attempting to do so, place and cause to be placed in an authorized depository for mail matter in the State and District of Maryland to be delivered by the United States Post Office Department a letter addressed to Mr. Gerald C. Jansek, Camdenton, Missouri, containing a financial statement of Security Financial Insurance Corporation, a brochure entitled "Questions & Answers about Savings Insured by Security Financial Insurance Corporation" and an advertising leaflet of Security Financial Insurance Corporation.

Title 18, U.S.C. §§ 2 and 1341

## COUNT EIGHT

1. The Grand Jury for the District of Maryland repeats, realleges and reiterates, with the same force and effect as though set forth at length herein, all of the allegations of Paragraphs 1, 2, 3 and 4 of Count One of this indictment.

2. That on or about the 19th day of June, 1961, the defendants Charles F. Culver, A. Gordon Boone, J. Thomas Ellicott, D. Spencer Grow, C. Oran Mensik and Henry McGurren did, for the purpose of executing the aforesaid scheme and artifice and attempting to do so, place and cause to be placed in an authorized depository for mail matter in the State and District of Maryland to be delivered by the United States Post Office Department a letter addressed to Mr. Thomas F. O'Connell, 34 Killmurray Street, Clinton, Massachusetts, containing a specimen copy of a Shareholder's Guarantee Policy of Security Financial Insurance Corporation, a financial statement of Security Financial Insurance Corporation as of December 31, 1960, and a brochure entitled "Questions & Answers about Savings Insured by Security Financial Insurance Corporation".

Title 18, U.S.C. §§ 2 and 1341